1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   STARLETT A. OLIVAS,                    No. CV 12-10320 SS

12                  Plaintiff,

13        v.
                                            **MEMORANDUM DECISION AND ORDER**
14   CAROLYN W. COLVIN,
     Commissioner of the Social
15   Security Administration,

16                  Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.**

**INTRODUCTION**

Starlett Olivas ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying her Disability Insurance Benefits and Supplemental Security Income. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is AFFIRMED.

**II.**

**PROCEDURAL HISTORY**

Plaintiff Starlett Olivas filed applications for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") on April 22, 2009. (AR 129-33). In both applications, Plaintiff alleged a disability onset date of October 1, 2000. (AR 129, 131). The Agency denied Plaintiff's applications on September 1, 2009, (AR 80-88), and upon reconsideration on April 26, 2010. (AR 91-102). On May 20, 2010, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 103). Plaintiff appeared and testified at a hearing held before ALJ Gail Reich on April 25, 2011. (AR 50). On May 9, 2011, the ALJ issued a decision denying Plaintiff DIB and SSI. (AR 10-22).

\\

Plaintiff requested review of the ALJ's decision, which the Appeals Council denied on August 16, 2012. (AR 1-3). Plaintiff filed the instant action on December 10, 2012.

### III.

#### FACTUAL BACKGROUND

Plaintiff was born on March 2, 1977. (AR 53). She was twenty-three years old as of the alleged disability onset date and thirty-four years old at the time of her hearing before the ALJ. (Id.). Plaintiff neither completed high school nor obtained a GED, and was found to have no past relevant work experience. (AR 20, 53). Plaintiff alleges that she was unable to engage in substantial gainful activity after October 1, 2000, because of the repeated dislocation of her right shoulder and pain associated with that condition. (AR 53-54, 56-60, 64-65, 149-50). She also claims that her ability to work was limited by mental illness, including depression, paranoia and bipolar disorder. (AR 53, 56, 60-63, 195). Plaintiff sought treatment for her shoulder condition in October 2000. (AR 239-45). Starting in October 2009, Plaintiff received regular mental health treatment. (AR 261-75, 293-321, 327-70).

\\
\\
\\
\\
\\
\\

A.     **Medical History and Treating Doctors' Opinions**

      1.     **Physical Condition**

On October 9, 2000, Plaintiff visited the Queen of Angels — Hollywood Presbyterian Medical Center ("Hollywood Medical Center") for an anterior dislocation of her right shoulder. (AR 239). Dr. Brian Harris examined Plaintiff in Hollywood Medical Center's emergency room. (Id.). Dr. Harris noted that Plaintiff presented with a "history of right shoulder pain and deformity consistent with chronic anterior subcoracoid dislocation." (AR 240). He also noted that Plaintiff had "six recent admissions to the emergency room for similar findings at which time she had undergone closed reduction without complications." (AR 240, 243). Plaintiff reported no weakness in her upper extremities to Dr. Harris. (Id.). Plaintiff was discharged from Hollywood Medical Center on October 9, 2000 and was provided a shoulder immobilizer and a prescription for Motrin 800 mg. (AR 245).[1]

\\

\\

\\

---

[1] Plaintiff was also admitted to Hollywood Medical Center on February 21, 2002 for a gunshot wound to the right knee. (AR 219). Plaintiff was discharged on February 26, 2002. (AR 224). The Court has reviewed the medical records related to this incident, and it does not appear that Plaintiff reported or received treatment for any shoulder-related condition during this stay at Hollywood Medical Center. (AR 219-38). Furthermore, Plaintiff does not claim that her February 21, 2002 gunshot wound resulted in a "disability" within the meaning of the Social Security Act.

4

1        **2.   Mental Condition**

2

3        Plaintiff visited the Santa Clarita Valley Mental Health

4    Center ("SC Health Center") on October 13, 2009. (AR 271-75).

5    Plaintiff reported, <u>inter alia</u>, mood swings, insomnia, delusional

6    ideas, difficulty controlling her anger, paranoia, and a history

7    of methamphetamine and crack cocaine abuse.  (AR 272, 275).  On

8    November 16, 2009, Dr. Afoksey Chetverukhim diagnosed Plaintiff

9    with bipolar disorder (mixed), polysubstance dependence (full-

10   remission),  rule-out  post-traumatic  stress  disorder  and

11   personality disorder.  (AR 264).  Based on this diagnosis, Dr.

12   Chetverukhim prescribed Plaintiff Seroquel and Prozac.  (<u>Id.</u>).

13   In  December  2009,  after  meeting  with  Plaintiff  again,  Dr.

14   Chetverukhim confirmed his diagnosis and maintained Plaintiff's

15   course of treatment.  (AR 263).  On June 24, 2010, Plaintiff

16   informed Dr. Chetverukhim that she had "relapsed on crack" one

17   week earlier.  (AR 300).  By September 2010, however, Plaintiff

18   reported  to  Dr.  Chevterukhim  that  she  was  "OK,"  and  Dr.

19   Chevterukhim changed Plaintiff's diagnosis to bipolar (mixed) and

20   polysubstance dependence (early remission).  (AR 298).

21

22   **B.   <u>Consultative Doctor's Opinion Regarding Plaintiff's Physical</u>**

23        **<u>Condition</u>**

24

25       On July 16, 2009, at the request of the Agency, Plaintiff

26   underwent an orthopedic examination conducted by Dr. Mario Luna.

27   (AR 246).  Plaintiff reported a nine-year history of upper and

28   lower back pain and right shoulder pain.  (<u>Id.</u>).  According to

5

Dr. Luna, Plaintiff had a history of right shoulder dislocations, with the most recent dislocation occurring approximately a week prior to the July 16 evaluation. (Id.). However, Plaintiff had not undergone any physical therapy or orthopedic surgery. (AR 246-47). Plaintiff's gait showed "normal cadence and velocity without signs of limp or antalgia." (AR 248). Plaintiff "[wa]s able to toe walk and heel walk and she [wa]s able to perform a full squat." (Id.). Plaintiff was also able to sit in a chair "comfortably without tilt[]" and "rise from a sitting and supine position without difficulty." Plaintiff was found to have no gross deformity, muscle atrophy, swelling, or tenderness in her right shoulder. (Id.). Radiographs of Plaintiff's right shoulder showed "no significant degenerative changes . . . , no lesions, no obvious defects in the humeral head and no significant degenerative changes in the acromioclavicular joint." (AR 251). Dr. Luna determined that Plaintiff had "[f]ull pain-free range of motion" in her right shoulder. (AR 248). Although Plaintiff had a positive apprehension test on her right shoulder, which is "consistent with some right shoulder instability[,]" the "prognosis for [Plaintiff's] right shoulder instability [wa]s good with the appropriate treatment." (Id.). Plaintiff also suffered from mild lumbar strain, but there was no evidence that Plaintiff suffered from lumbar radiculopathy, and "[r]adiographs of the lumbar spine were within normal limits." (Id.). Dr. Luna diagnosed Plaintiff with lumbar strain, history of right shoulder instability and history of right shoulder dislocations. (AR 251).

\\

Based on his findings, Dr. Luna determined that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, push and pull appropriate weight on a frequent basis, stand and sit without limit, and bend, kneel, crawl, stoop, or crouch on a frequent basis. (AR 251). Plaintiff faced "no limitations to overhead activities with the left upper extremity[,]" and could perform overhead activities with her right upper extremity on a frequent basis. (Id.). Finally, Dr. Luna deemed Plaintiff capable of unlimited fine and gross manipulative movements with both hands. (Id.).

**C.**     **Non-Examining Doctors' Opinions Regarding Plaintiff's Physical and Mental Conditions**

        **1.    Physical Condition**

            a.   Dr. De La Rosa

On August 25, 2009, at the request of the Agency, Dr. C. De La Rosa completed a Physical Residual Functional Capacity Assessment of Plaintiff based on a review of Plaintiff's medical records. (AR 253-60). Dr. De La Rosa's conclusions confirmed Dr. Luna's opinion regarding Plaintiff's physical limitations. (AR 19). Dr. De La Rosa found that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for six hours, sit for six hours, and push and/or pull without limitation. (AR 254). Furthermore, Plaintiff had no postural limitations and could

frequently engage in overhead activity with her right upper extremity. (AR 255).

b. Dr. Maxwell

After reviewing the record and being present for Plaintiff's testimony before the ALJ, non-examining physician Dr. Thomas Maxwell testified as a Medical Expert ("ME") before the ALJ concerning Plaintiff's physical condition. Dr. Maxwell concluded that Plaintiff's "medical problems include[d] degenerative disc diseases of the cervical spine, degenerative joint diseases of the cervical spine, recurrent dislocation of the right shoulder and obesity." (AR 65). According to Dr. Maxwell, Plaintiff was therefore "limited to lifting and/or carrying tend pounds both frequently and occasionally, would be able to sit for six hours, stand and/or walk for six hours," but would not be able to "climb[] . . . ladders, ropes or scaffolds." (AR 66). Plaintiff also had to avoid working at unprotected heights or with hazardous machinery, and she could not reach overhead with her right upper extremity. (Id.). However, she was able to push and/or pull with the right upper extremity occasionally. (Id.).

2. **Mental Condition**

a. Dr. Franco

On April 14, 2010, at the request of the Agency, Dr. Anna M. Franco completed a Mental Residual Functional Capacity Assessment

1  of Plaintiff.  (AR 290-92).  Dr. Franco concluded that Plaintiff

2  was "moderately" limited in her abilities to understand, remember

3  and carry out detailed instructions, work with others without

4  being distracted, and interact appropriately with the general

5  public.  (AR 290-91).  Dr. Franco found no other mental

6  limitations.  (Id.)  She therefore concluded that Plaintiff was

7  capable of understanding short and simple instructions and work

8  procedures, maintaining attention and concentration for extended

9  periods, sustaining a work routine without special supervision,

10 making work-related decision, completing a normal workday without

11 psychological disruptions, maintaining socially appropriate

12 behavior in the workplace, interacting normally with coworkers

13 and peers, and adapting to her work environment.  (Id.)

14

15        b.   Dr. Griffin

16

17     After reviewing the record and being present for Plaintiff's

18 testimony before the ALJ, ME Dr. Glenn Griffin testified

19 concerning Plaintiff's mental condition.  Dr. Griffin found that

20 because of Plaintiff's bipolar disorder and substance abuse,

21 Plaintiff was able to perform work activity requiring detailed

22 and complex tasks only occasionally.  (AR 71).  However,

23 Plaintiff's mental condition placed no limits on her ability to

24 perform simple, repetitive tasks or to frequently interact with

25 peers, coworkers and supervisors.  (Id.).

26 \\

27 \\

28 \\

9

**D.   Vocational Expert Testimony**

Vocational   Expert   ("VE")   Frank   Corso   testified   at
Plaintiff's   hearing   regarding   the   existence   of   jobs   in   the
national   economy   that   Plaintiff   could   perform   given   her   physical
and   mental   limitations.   (AR 72-74).   The ALJ asked the VE to
consider   an   individual   with   Plaintiff's   age,   education,   work
experience,   and   the   physical   and   mental   limitations   that   Drs.
Maxwell   and   Griffin   identified.   (AR 72).   The VE testified that
an   individual   sharing   Plaintiff's   age,   education,   experience   and
mental   and   physical   limitations   would   be   able   to   perform   work   as
a   final   assembler   at   the   sedentary   level   of   physical   exertion,   a
sorter   of   small   agricultural   products   performed   at   the   sedentary
level   of   physical   exertion,   a   painter   of   small   items   performed   at
the   sedentary   level   of   physical   exertion,   and   a   small   products
assembler   at   the   light   level   of   physical   exertion.   (AR 21, 73-
74).   The   VE   opined   that   these   jobs   existed   in   significant
numbers   in   the   national   economy   and   in   Plaintiff's   local   economy,
and   he   provided   specific   job   numbers   for   each   occupation.   (Id.).

**E.   Plaintiff's Grandfather's Third Party Function Report**

On   January   25,   2010,   Plaintiff's   grandfather,   Frank   Luna,
completed   a   Third   Party   Function   Report   ("TPF   Report")   regarding
how   Plaintiff's   alleged   disability   limited   her   daily   activities.
(AR 186).   According   to   Mr.   Luna,   who   knew   Plaintiff   her   since
her   birth   and   frequently   interacted   with   her,   Plaintiff   was   no
longer   able   to   bend   down,   reach   and   pull   because   of   her   shoulder

10

condition.  (AR 186-87).  Moreover, she could walk only a "couple of blocks" before needing rest.  (AR 191).  Plaintiff also displayed forgetfulness and occasionally needed to be reminded to bathe and take her prescribed medication.  (AR 187-88).  Mr. Luna described Plaintiff as "not inclined to associate[] with others" and preferring to spend her time watching television throughout the day.  (AR 190).  She also "squabble[d]" with her family over simple things and was no longer interested in socializing with family members.  (Id.).  Furthermore, Plaintiff had a short attention span, could not follow instructions and had "problems following rules."  (AR 191-92).  She also handled stress "very badly."  (AR 192).

**F.  <u>Plaintiff's Testimony</u>**

With respect to her physical health, Plaintiff testified that she could not engage in substantial gainful employment because her right arm was "constantly coming out," i.e., dislocating.  (AR 56).  Although Plaintiff attempted to work in 2007 and 2008, her right arm "would constantly pop out" as a result of pushing shopping carts and climbing to grab and/or reaching for items.  (AR 54).  The ALJ asked Plaintiff how often her right shoulder dislocated, and she responded "[a]bout twice a month or so."  (AR 58).  Plaintiff testified that her shoulder dislocations were a function of how she moved her arm, not how much weight she lifted.  (AR 58-59).  For example, her shoulder could "pop out" if she reached to pick up a sheet of paper from the floor or if she stretched while asleep.  (AR 58, 65).

11

However, after her shoulder dislocated, she could sometimes "pop [it] in" with the help of her live-in boyfriend.  (AR 58).  The ALJ asked Plaintiff about any pain associated with her shoulder condition, and Plaintiff stated that she suffered constant pain in her back and neck.  (AR 59).  Plaintiff took Naproxen and Trazodone for the pain, but these medications only helped her manage the pain, they did not cure it.  (AR 59).

Regarding her mental health, Plaintiff testified that her ability to work was limited because she was "very paranoid about . . . being around people, and to top it off, [she was] very tired." (AR 56).  When she attempted to work in 2007 and 2008, she was not "comfortable" with "a lot of people" surrounding her.  (AR 54).  Plaintiff also testified that she continued to hear whispering voices.  (AR 61).  The ALJ asked Plaintiff about her drug use, and Plaintiff testified that she used cocaine and marijuana in the past, but stopped around 2006.  (AR 57).  When asked about a medical report in the record indicating that she used drugs in July 2010, Plaintiff testified that she relapsed when her boyfriend kicked her out of her house and she lived on the street for two days.  (AR 67).  Plaintiff later testified that she may have used cocaine once or twice after July 2010. (AR 67-68).

\\

\\

\\

\\

\\

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the

13

claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled. If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock

14

1  v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant

2  has  both  exertional  (strength-related)  and  non-exertional

3  limitations, the Grids are inapplicable and the ALJ must take the

4  testimony of a vocational expert.  Moore v. Apfel, 216 F.3d 864,

5  869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335,

6  1340 (9th Cir. 1988)).

7

8                                    **V.**

9                          **THE ALJ'S DECISION**

10

11      The ALJ employed the five-step sequential evaluation process

12  and concluded that Plaintiff was not under a disability within

13  the meaning of the Social Security Act from October 1, 2000

14  through the date of the ALJ's decision on May 9, 2011.  (AR 10).

15  At step one, the ALJ found that Plaintiff had not engaged in

16  substantial gainful employment since October 1, 2000.[2] (AR 12).

17  At step two, the ALJ found that Plaintiff had the severe

18  impairments of degenerative disc/joint disease of the cervical

19  spine, recurrent dislocation of the right shoulder, obesity,

20  bipolar disorder and history of polysubstance abuse.  (AR 13).

21  At step three, the ALJ found that Plaintiff did not have an

22

---

23  [2] Although Plaintiff's earning records showed earnings from 2007
24  to 2009, the ALJ determined there was "insufficient information
    to determine whether or not [Plaintiff's] monthly income rose to
25  the level of disqualifying substantial gainful activity, and if
    so whether it would qualify as an unsuccessful work attempt."
26  (AR 12).  However, the ALJ concluded that because "the evidence
    supports the finding that [Plaintiff] at all times relevant to
27  this decision was and is 'not disabled' for other reasons[,]" it
    was not necessary to make an "outcome-determinative finding at
28  this step of the sequential evaluation process."  (AR 12-13).

impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.). The ALJ then found that Plaintiff had the following "much-reduced" RFC:

> [Plaintiff is able] to lift and/or carry ten pounds both frequently and occasionally; she could sit, stand, and/or walk for six hours each in an eight-hour window; she must avoid climbing ladders, ropes, and/or scaffolds; she should avoid unprotected heights and hazardous machinery; she must avoid work requiring her to reach overhead with the right upper extremity; she can only occasionally use her right upper extremity for pushing and pulling; she can only occasionally perform postural activities; she can frequently perform activities requiring fine and gross manipulations; she can only occasionally perform work activity requiring detailed or complex tasks, but she has no restrictions in her ability to perform simple, repetitive tasks; and she can frequently engage in work activity requiring her to interact with peers, co-workers, and supervisors.

(AR 15). In making this finding, the ALJ assigned Plaintiff a more restrictive, i.e., a more favorable RFC than that which Agency examining and non-examining physicians Drs. Luna and De La Rosa found. (AR 19-21). The ALJ gave considerable weight to the testimony of non-examining physician Dr. Maxwell, who "as an

1    expert witness before the Social Security Administration . . . ,
2    ha[d] a knowledge of [the Agency's] disability program and had
3    access to all of the medical evidence of record, including
4    [Plaintiff's] testimony, when he offered his opinion."  (AR 19).
5    The ALJ noted that the record "d[id] not contain any opinions
6    from treating or examining physicians indicating that [Plaintiff]
7    ha[d] physical limitations greater than those identified by the
8    medical expert."  (Id.).

9

10        The ALJ also gave substantial weight to the testimony of
11   non-examining ME Dr. Griffin, who testified regarding Plaintiff's
12   mental condition.  (Id.).  The ALJ explained that Dr. Griffin was
13   "a licensed psychologist and, as an expert witness before the
14   Social Security Administration," his testimony shared the same
15   hallmarks of credibility that Dr. Maxwell's testimony possessed.
16   (AR 20).   Furthermore, Dr. Griffin's testimony was "not
17   inconsistent with non-examining State Agency psychologist Anne
18   Franco . . . [who] opined that [Plaintiff] would have moderate
19   limitations" in her ability to perform certain work-related
20   functions, including understanding, remembering and carrying out
21   detailed instructions, working in coordination with or proximity
22   to others without being distracted and interacting appropriately
23   with the general public.  (Id.).   The ALJ explained that the
24   record did not contain any opinions from treating or examining
25   physicians indicating that Plaintiff had greater limitations than
26   those identified by Dr. Griffin, and the ALJ found it dubious
27   that Plaintiff suffered from "totally disabling" mental illness

28

given the record's complete absence of "restrictions placed on [Plaintiff] by the treating doctor."  (Id.).

The ALJ afforded little weight to the Third Party Adult Function Report that Plaintiff's grandfather, Frank Luna, completed.  (AR 186-93).  The ALJ did not consider Mr. Luna a disinterested third party witness given his family relationship with Plaintiff, and the ALJ noted that many of Mr. Luna's allegations were "simply not consistent with the preponderance of the opinions and observations by medical doctors in the case." (Id.).  Furthermore, the ALJ noted that Mr. Luna was not medically trained, and his opinions regarding Plaintiff's physical and mental medical symptoms were therefore of limited assistance.  (Id.).

At step four, the ALJ determined that Plaintiff had no relevant past work.  (AR 20).  At step five, the ALJ considered Plaintiff's age, education, work experience and RFC.  (Id.). Plaintiff was twenty-three years old on the alleged disability onset date of October 1, 2000, and she was therefore a "younger individual" pursuant to 20 C.F.R. 404.1563.  (Id.).  Plaintiff did not graduate high school or obtain a GED, and the ALJ determined that she had "limited education" but was able to communicate in English.  (Id.).  Because Plaintiff had no past relevant work, the transferability of job skills was not an issue.  (Id.).

18

Next, based on the testimony of VE Frank Corso, the ALJ found that, considering Plaintiff's age, education, work experience and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (AR 20-21). The ALJ concluded that Plaintiff could perform the work of a final assembler, a sorter of small agricultural products, a painter of small items, or a small products assembler. (AR 21). The ALJ further determined that such jobs existed in significant numbers in the national economy. (AR 21-22).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066;

1    Smolen, 80 F.3d at 1279).    To determine whether substantial

2    evidence supports a finding, the court must "'consider the record

3    as a whole, weighing both evidence that supports and evidence

4    that detracts from the [Commissioner's] conclusion.'"  Aukland,

5    257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

6    Cir. 1993)).    If the evidence can reasonably support either

7    affirming or reversing that conclusion, the court may not

8    substitute its judgment for that of the Commissioner.  Reddick,

9    157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457

10   (9th Cir. 1995)).

11

12                                  **VII.**

13                              **DISCUSSION**

14

15        Plaintiff challenges the ALJ's decision on two grounds.

16   First, Plaintiff contends that the ALJ erred by rejecting her

17   subjective testimony concerning her symptoms without clear and

18   convincing reasons for doing so.  (Memorandum in Support of

19   Plaintiff's Complaint ("MSPC") at 4-13).  According to Plaintiff,

20   the ALJ's decision is "void of any sufficient rationale at all as

21   to why the ALJ ignored and disregard[ed] [Plaintiff's]

22   testimony."  (Id. at 5-8).  Second, Plaintiff claims, in

23   conclusory fashion, that the ALJ's non-disability determination

24   is not supported by substantial evidence.  (Id. at 2; see also

25   Complaint at 2-3).  However, Plaintiff offers no actual analysis

26   explaining why the evidence the ALJ relied upon in reaching her

27   decision did not qualify as "substantial."

28

1      The Court disagrees with Plaintiff on both grounds.  The ALJ
2  not only cited clear and convincing reasons for rejecting
3  Plaintiff's subjective testimony, but also based her decision on
4  "substantial evidence."  Accordingly, for the reasons discussed
5  below, the Court finds that the ALJ's decision must be AFFIRMED.

6

7  **A.   The ALJ Cited Clear And Convincing Reasons For Finding**
8       **Plaintiff's Subjective Testimony Less Than Fully Credible**

9

10     Plaintiff contends that the ALJ erred by failing to
11  articulate clear and convincing reasons for finding Plaintiff's
12  subjective testimony less than fully credible.  (MSPC at 4).  The
13  Court disagrees.  The ALJ's decision contains extensive citation
14  to and discussion of clear and convincing reasons for rejecting
15  Plaintiff's testimony.

16

17     When assessing the credibility of a claimant, the ALJ must
18  engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104,
19  1112 (9th Cir. 2012).  First, the ALJ must determine if there is
20  medical evidence of an impairment that could reasonably produce
21  the symptoms alleged.  (Id.).  Then, if there is, in order to
22  reject the testimony, the ALJ must make specific credibility
23  findings.  (Id.).  In assessing the claimant's testimony, the ALJ
24  may use "ordinary techniques of credibility evaluation."  Turner,
25  613 F.3d at 1224 (internal quotations omitted). The ALJ may also
26  consider any inconsistencies in the claimant's conduct and any
27  inadequately or unexplained failure to pursue treatment or follow
28  treatment.  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir.

2008).   Additionally, the ALJ may discredit the claimant's testimony where his normal activities can transfer to the work setting.  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).  Here, there was medical evidence of an underlying impairment.  However, the ALJ articulated specific, clear and convincing reasons for discounting Plaintiff's testimony about the severity of her physical and mental symptoms.

First, the ALJ cited Plaintiff's failure to pursue treatment for her physical and mental conditions as an indication that her testimony was unreliable.   The ALJ noted "the record is noticeably absent any indication that [Plaintiff] has received any treatment for her right shoulder impairment or lower back pain since 2002 – a period of more than eight years."[3]   (AR 15). Furthermore, the record did not contain any progress reports, imaging reports, physical therapy reports, prescriptions, or other evidence indicating that Plaintiff sought treatment for her purportedly disabling physical condition after 2000.  (Id.). Moreover, "the record reflect[ed] a . . . lack of pursuit of any mental health treatment until late 2009."  (AR 18). Additionally, record lacked evidence that Plaintiff followed psychiatrist Dr. Chetverukhim's recommendations that she partake in group psychotherapy and substance abuse counseling.  (AR 18).

---

[3] As discussed supra, Plaintiff was admitted to Hollywood medical center in 2002 for a gunshot wound to the right knee.  However, it does not appear that she reported or received treatment for any shoulder-related condition during her five-day stay at Hollywood Medical Center.  It therefore appears that the ALJ gave Plaintiff the benefit of the doubt and assumed that while she was admitted to Hollywood Medical Center, she received at least some treatment for her purported shoulder condition.

22

1    The Court agrees with the ALJ's finding that Plaintiff's
2    unexplained failure to seek treatment and follow her doctor's
3    recommendations renders her allegations of "constant" shoulder
4    dislocation, "constant" pain and severe mental illness
5    questionable.   Were Plaintiff's symptoms as severe as she
6    claimed, it seems likely that she would have needed and sought
7    treatment more often than the record reflects.   Further, as a
8    matter of law, the ALJ's reliance on and citation to Plaintiff's
9    failure to seek treatment, as part of the ALJ's evaluation of
10   Plaintiff's subjective testimony, was proper.   See Tommasetti,
11   533 F.3d at 1039 (an ALJ may consider many factors in weighing a
12   claimant's credibility, including "unexplained or inadequately
13   explained failure to seek treatment or to follow a prescribed
14   course of treatment[]") (internal quotation marks omitted).
15   Where, as here, "a claimant[] fail[s] to assert a good reason for
16   not seeking treatment," an ALJ may consider this inaction as
17   "cast[ing] doubt on the sincerity of the claimant's" subjective
18   testimony.   Molina, 674 F.3d at 1113).

19

20       Second, the ALJ cited evidence that Plaintiff's mental
21   condition improved with treatment and medication.   The ALJ noted
22   that "the progress notes from Dr. Chetverukhim do not establish
23   the presence of a disabling mental illness . . . [and] do not
24   provide any serious clinical signs or observations, and the fact
25   that [Plaintiff's] symptoms were managed with psychoactive
26   medication is significant."   (AR 18).   The ALJ further explained
27   that "[w]hen [Plaintiff] was taking her psychotropic medications
28   as prescribed and maintaining sobriety, her symptoms appeared to

have improved.   The record suggests that the only times the claimant's symptoms were more severe [were] during periods of cocaine abuse."   (Id.).   The record bears out the ALJ's point. Plaintiff's doctors at SC Health Center listed Plaintiff's condition as "stabilized" once she started taking her prescribed medications.   (AR 294, 298, 303, 305, 309, 331).   Plaintiff reported feeling "OK" in September 2010, (AR 298), and denied experiencing side effects from her medications on numerous occasions.   (AR 63, 299, 300, 303, 305, 309, 331).   As the Ninth Circuit has explained, "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."   Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006)) (citing cases).   Accordingly, the ALJ, in discounting Plaintiff's testimony, properly relied on evidence that Plaintiff's mental illness, if treated properly, was stable, manageable and did not rise to the level of a "disability."

Third, the ALJ properly cited inconsistencies between Plaintiff's testimony and the objective medical evidence to discredit Plaintiff's subjective testimony.   The Court notes it is improper for an ALJ to reject subjective testimony based "solely" on its inconsistencies with the objective medical evidence presented.   Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (citing Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991)).   However, an ALJ may consider such inconsistencies as one factor, among many, bearing on the credibility of a plaintiff's subjective testimony.   See, e.g.,

1  Thomas v. Barnhart, 278 F.3d 947, 958-60 (9th Cir. 2002) (ALJ

2  properly considered the lack of objective medical evidence, as

3  well as other factors, in evaluating the credibility of a

4  plaintiff's subjective testimony regarding the severity of her

5  impairments and pain); Morgan, 169 F.3d at 599-600 (same).

6

7      Here, the ALJ noted numerous inconsistencies calling into

8  doubt the "extreme" physical and mental limitations that

9  Plaintiff alleged.  (AR 16).  Regarding Plaintiff's physical

10 impairments, the ALJ noted that when Plaintiff underwent an

11 orthopedic examination in July 2009, she was found to have "a

12 normal gait with no signs of limp or antalgia[,] [s]he was able

13 to rise from a seated and supine position without difficulty[,]

14 [s]he exhibited full and pain-free motion of the cervical and

15 thoracolumbar spine[,] [and w]hile there was 'mild' tenderness to

16 palpation of the lumbar paraspinal musculature, there were no

17 muscle spasms . . . , and there was no evidence of nerve root

18 irritation."  (AR 16) (citing AR 246-52).  Moreover, x-rays

19 showed no signs of spondylosis or degenerative disc disease or

20 scoliosis, examination of Plaintiff's upper and lower extremity

21 joints was normal except for the right shoulder, and Plaintiff

22 exhibited "no deformity, no tenderness and normal range of motion

23 of the right shoulder[.]"  (Id.).  The ALJ also noted that "[a]n

24 x-ray of the right shoulder showed 'no significant degenerative

25 changes at the glenohumeral joint, no lesions, no obvious defects

26 in the humeral head and no significant degenerative changes in

27 the acromioclavicular joint.'"  (Id.).

28

With respect to Plaintiff's mental condition, the ALJ cited Plaintiff's medical records from SC Health Center, which indicated that Plaintiff's mental health stabilized while she was on medication and deteriorated only when she relapsed on drugs. (AR 16-17) (citing AR 261-75, 293-321). Moreover, Plaintiff alleged a level of severity at odds with the conclusions of all the mental health doctors who treated her or reviewed her medical records. (AR 19-20). Accordingly, the ALJ properly relied on this contradiction, together with other factors, in discounting Plaintiff's subjective testimony.

Fourth, the ALJ cited Plaintiff's own contradictory statements as a basis for doubting the credibility of her subjective testimony. (AR 18). Regarding her physical condition, Plaintiff indicated in her Form SSA-3368 Disability Report that her right shoulder dislocated "all the time." (AR 150). However, she testified before the ALJ that her shoulder dislocated only "twice a month." (AR 58). According to the ALJ, Plaintiff also made "inconsistent statements about her history of drug abuse and sobriety." (AR 18). In 2009, Plaintiff informed Dr. Luna that she had "never" used drugs. (AR 247).[4] However, Plaintiff reported a history of crack cocaine and methamphetamine abuse to the SC Health Center that same year. (AR 275). At the hearing, the ALJ asked Plaintiff specifically about her drug use, and Plaintiff testified that she last used marijuana and cocaine

_____

[4] Plaintiff made this representation despite other evidence in the record that she had served two jail sentences for drug possession. (AR 265) ("Legal [ ] possession of drugs; jail X2 2001/2006").

in 2006.   (AR 57).   She made no mention of ever using methamphetamine.   Later during the hearing, Plaintiff admitted that she relapsed several times in 2010, although she could not remember exactly how many times she used drugs after July 2010. (AR 67).   Based on this inconsistent testimony, the ALJ properly concluded that "[a]lthough the inconsistent information provided by [Plaintiff] may not be the result of a conscious intention to mislead, the inconsistencies suggest that the information provided by [her] is not reliable."   (AR 18).   See Molina, 674 F.3d at 1112 ("In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation[] . . . [and] . . . may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct[.]") (internal quotation marks omitted).

    Thus, after reviewing the ALJ's decision and based on the foregoing, the ALJ provided ample clear and convincing reasons for discounting Plaintiff's subjective testimony.

**B.   Substantial Evidence Supported The ALJ's Non-Disability Determination**

    Plaintiff claims that the ALJ's non-disability determination was not supported by substantial evidence, but offers no explanation or analysis to support her argument. (MSPC at 2; Complaint at 2-3).   Nevertheless, to the extent Plaintiff attacks the ALJ's non-disability finding on this ground, the Court concludes that the ALJ's decision was supported by substantial

1    evidence.   As discussed supra, "[s]ubstantial evidence is more

2    than a scintilla, but less than a preponderance." Reddick, 157

3    F.3d at 720 (citing Jamerson, 112 F.3d at 1066).  It is "relevant

4    evidence which a reasonable person might accept as adequate to

5    support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066;

6    Smolen, 80 F.3d at 1279).   Here, the medical evidence in the

7    record, coupled with the testimony of non-examining Agency

8    physicians Drs. Maxwell and Griffin and Vocational Expert Frank

9    Corso, was more than adequate to support the ALJ's decision.

10

11       First, the objective medical evidence supported the RFC that

12   the ALJ assigned to Plaintiff.  (AR 15).   In 2009, examining

13   physician Dr. Luna conducted an orthopedic examination on

14   Plaintiff.  (AR 246-52).  He observed that Plaintiff's gait was

15   normal, that Plaintiff could perform a full squat and that she

16   was able to sit in a chair comfortably and rise from a seated or

17   supine position without difficulty.  (AR 248).  Dr. Luna also

18   observed that Plaintiff's thoracolumbar spine was normally

19   curved, showed no signs of muscle spasm or nerve root tension and

20   permitted Plaintiff full pain-free range of motion.   (Id.).

21   Plaintiff's right shoulder showed no deformity, muscle atrophy,

22   swelling or tenderness, and Plaintiff had full, pain-free range

23   of motion.   (Id.).   Radiographs taken during the evaluation

24   showed no signs of degenerative disc disease or scoliosis of the

25   spine, and x-rays of Plaintiff's right shoulder indicated "no

26   significant degenerative changes . . . , no lesions, no obvious

27   defects in the humeral head and no significant degenerative

28   changes in the acromioclavicular joint." (AR 251).  Based on

this and other medical evidence in the record, and after listening to Plaintiff's testimony, Dr. Maxwell testified before the ALJ that Plaintiff's physical limitations were more serious than what Drs. Luna and De La Rosa concluded but not as severe as Plaintiff claimed. (AR 65-68). Dr. Maxwell testified that Plaintiff was limited to lifting and/or carrying ten pounds frequently and occasionally, would be able to sit for six hours, and stand and/or walk for six hours. (AR 66). He further opined that Plaintiff should avoid climbing ladders, ropes, or scaffolds, and should avoid working at unprotected heights or with hazardous machinery. (Id.). Though Plaintiff could not reach overhead with her right upper extremity and could only occasionally push and/or pull with her right upper extremity, Dr. Maxwell found she could engage in fine and gross manipulation frequently. (Id.). Ultimately, the ALJ adopted Dr. Maxwell's more restrictive assessment of Plaintiff's abilities.

     With respect to Plaintiff's mental health, the medical evidence in the record indicated that Plaintiff's condition improved and stabilized once she sought treatment at SC Health Center in 2009 – indeed, Plaintiff's mental health appears to have deteriorated only when she relapsed into drug use. (AR 261-75, 293-321). Based on a review of the record, and after hearing Plaintiff's testimony, Dr. Griffin, testified that Plaintiff's mental health limitations were "moderate." (AR 71). According to Dr. Griffin, Plaintiff had "mild restrictions" in the activities of daily living and "moderate difficulty" in social functioning and concentration, but "no restrictions in regards to

1   simple repetitive work[.]" (Id.). He also found that Plaintiff

2   could "occasionally" do detailed and complex work, and "would be

3   able to interact with peers, coworkers, [and] supervisors on a

4   frequent basis." (Id.). Dr. Griffin's conclusions were largely

5   consistent with the Mental Residual Functional Capacity

6   Assessment that Dr. Franco completed in April 2010. (AR 20, 290-

7   92).

8

9       Plaintiff's testimony and the TPF Report completed by

10  Plaintiff's grandfather were the only evidence contradicting the

11  objective medical findings in the record. For reasons discussed

12  supra, the ALJ properly rejected Plaintiff's subjective

13  testimony. Moreover, the ALJ specifically addressed the Third

14  Party Adult Function Report and decided to afford it little

15  weight given its author's close family relationship to Plaintiff

16  and his (Plaintiff's grandfather's) lack of medical training.

17  (AR 18).

18

19      Second, the testimony of VE Frank Corso supported the ALJ's

20  determination that there were jobs in significant numbers in the

21  national economy that Plaintiff could perform considering her

22  age, education, work experience and RFC. An ALJ may properly

23  rely on the testimony of a VE where the ALJ poses a hypothetical

24  "contain[ing] all the limitations the ALJ found credible and

25  supported by substantial evidence in the record." Bayliss v.

26  Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005). Moreover, an ALJ

27  may rely on a VE's testimony regarding the number of relevant

28  jobs in the national economy, as "[a]n ALJ may take

administrative notice of any reliable job information, including information provided by a VE." Id. at 1218 (citing Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995).

Here, the ALJ asked the VE whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience and RFC. (AR 72-73). Before the VE responded, the ALJ confirmed that the VE recalled all of Plaintiff's physical and mental limitations and offered to repeat the limitations if necessary. (AR 72-73). The VE then testified that an individual sharing Plaintiff's age, education, experience and mental and physical limitations could perform work as a final assembler at the sedentary level of physical exertion, a sorter of small agricultural products performed at the sedentary level of physical exertion, a painter of small items performed at the sedentary level of physical exertion, and a small products assembler at the light level of physical exertion. (AR 21, 73-74). He also testified that these jobs existed in significant numbers in the national economy and in Plaintiff's local economy. (Id.).

In sum, there was substantial evidence supporting the ALJ's non-disability finding in this case. No remand is necessary.

\\
\\
\\
\\
\\

31

**III.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.


DATED:  October 22, 2013                    _____/S/_____

                                            SUZANNE H. SEGAL
                                            UNITED STATES MAGISTRATE JUDGE